# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 07-1334

_____

United States of America,      *
                                       *

         Plaintiff - Appellee,    *
                                         * Appeal from the United States

    v.                               * District Court for the

                                                 * District of Nebraska.

Thomas Neal Wright,        *

                                                 *

         Defendant - Appellant.    *

_____

Submitted: October 16, 2007
Filed: January 7, 2008

_____

Before MURPHY, MELLOY, and COLLOTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Appellant Thomas Neal Wright appeals the district court's[1] denial of his motion to suppress 24.7 kilograms of cocaine and incriminating statements he made in the course of a traffic stop. We affirm.

On June 2, 2005 Wright was driving a pickup eastbound on Interstate 80 in Hamilton County, Nebraska when he noticed signs indicating that a state patrol

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

checkpoint with a drug dog was located past the next freeway exit. The signs were placed approximately 600 feet west of the Phillips interchange which has an eastbound exit ramp. The exit ramp accesses County Road B which turns into a gravel road approximately 200 yards south of the interstate just past a KOA campground. Other than at the campground there are no services or signs for services at the Phillips interchange.

The state patrol had set up the checkpoint as a ruse designed to induce drug traffickers to avoid it by leaving the highway. Troopers Jason Probasco and Bradley Hand had arranged the checkpoint and had placed an unoccupied patrol car with activated overhead lights at the underpass of the Phillips interchange. The troopers waited in another patrol vehicle off the highway, near an abandoned gas station south of the interstate and on the east side of County Road B. The spot at which they were parked was approximately seventy five yards from the stop sign at the top of the eastbound exit ramp. From their location the troopers watched for vehicles with out of state license plates leaving the freeway and then made contact with those motorists who committed traffic violations.

Wright left the freeway at the Phillips exit, and the troopers observed that he failed to make a complete stop at the sign at the top of the exit ramp before turning south onto County Road B and continuing past the KOA campground. Hand, who was using binoculars, noticed that Wright's pickup had Nevada license plates, and the officers found it unusual that an out of state vehicle would exit at that location and not enter the campground. They stopped Wright's vehicle, and Probasco initiated conversation with him. Hand followed to record the conversation because he had a microphone set to the same frequency as their patrol camera. The ensuing conversation was inaudible on the recording, however, because of background noise from Wright's diesel engine and radio and the distance at which Hand was standing.

Probasco noticed that Wright's hands were trembling "extremely bad [sic]" while he searched for his vehicle registration and that his voice was quivering. Probasco asked why Wright had exited the interstate, and he responded that he was tired and looking for a place to rest. When asked why he had not pulled into the KOA campground, Wright said that he did not have camping gear and did not see any buildings. Wright was not able to find the vehicle registration.

At this point Probasco asked Wright to go to the patrol vehicle with him so that he could issue a warning ticket for not stopping at the stop sign. While walking back to the patrol vehicle, the troopers observed equipment in the bed of the pickup. Wright told them he was hauling stage equipment from Las Vegas to the Twin Cities. While Wright sat in the front of the patrol car, Probasco checked his driver's license, criminal history, and vehicle registration. He asked Wright again about the equipment he was transporting, and Wright replied that he was driving to Minneapolis to set up a stage for a show. When asked again why he had taken this exit, Wright stated that he had hoped to make it to Omaha but decided that he needed to rest.

Because Probasco had become suspicious that Wright was carrying drugs, he told Hand to call for a drug dog. While Probasco wrote the warning ticket, he asked Wright if there was any contraband in his vehicle. Wright denied having any drugs or drug paraphernalia. When the trooper commented that law enforcement often uses ruse checkpoints to detect criminal activities, Wright claimed that he had not seen the drug checkpoint signs on the interstate. Since the microphone was not set to pick up conversations in the front seat of the patrol car, their conversation was not audible on the recording.

Probasco completed the warning ticket and returned Wright's driver's license. As Wright was walking back to his pickup, Probasco asked him if he could ask a few questions. Wright agreed. Probasco again asked if there were drugs in the pickup, and Wright again denied having any. Probasco then requested permission to search

his vehicle, and Wright consented. As soon as it was clear that they intended to search the pickup on the spot, he withdrew his consent. Probasco then told him he would have to stay at the scene until the drug dog arrived.

While they waited for the drug dog, Hand commented that motorists who exit the freeway after a drug checkpoint sign are usually doing something illegal. He commented that if Wright had a marijuana pipe or small amount of marijuana in the pickup, it would be an infraction under Nebraska law similar to a speeding ticket. Wright looked down, and Hand repeated that an infraction was basically like a speeding ticket. He said that if Wright had anything, it would be better to tell the officers. Wright responded that he had just done a couple lines of cocaine with a rolled up dollar bill that was between his seat and the console. Hand found a dollar bill with white residue in the pickup cab at the spot Wright told him to look. Wright then informed the troopers that there was a white bindle in the cooler, and Hand retrieved it.

Probasco put Wright in the patrol car and began to write a citation for possession of drug paraphernalia. Hand had meanwhile contacted the dog handler to tell him he was not needed because Wright had admitted to possession of drug paraphernalia. The canine officer arrived anyway and deployed the drug dog who alerted on the rear passenger side of Wright's pickup. Hand and George Scott, another trooper who had come to the scene, searched the vehicle and found a brick of cocaine. Wright was placed under arrest at this point but not advised of his Miranda rights. While he and Probasco were waiting in the patrol car, Hand and Scott found a suitcase in the rear seat of his pickup. Wright then told Probasco, "They found the rest of it. That thing's full of cocaine."

On June 22, 2005 a federal grand jury returned a two count indictment charging Wright with possession with intent to distribute 5 kilograms or more of a cocaine substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1), and criminal forfeiture

pursuant to 21 U.S.C. § 853.  Wright moved to suppress the evidence seized after his stop as well as his incriminating statements.  An evidentiary hearing was held on October 28, 2005 and continued on November 1, 2005.  The court received additional evidence on December 27, 2005.

The magistrate judge[2] filed a report and recommendation recommending that Wright's suppression motion be denied.  Wright filed objections, arguing in part that the magistrate judge had not addressed a videotape which showed that the troopers could not have seen his vehicle at the stop sign.  This video was made by Scott's patrol vehicle as he drove up the exit ramp at the Phillips interchange, and Wright argued that it showed that trees blocked the view of Probasco and Hand so they could not have seen a vehicle fail to stop at the sign.  The district court adopted the magistrate's report and recommendation after making an additional factual finding that the videotape did not support Wright's argument about what the video showed.  Wright then pled guilty to both counts of the indictment and was sentenced to 121 months in prison followed by a five year term of supervised release.  Wright now appeals the denial of his motion to suppress.

The district court's order denying the motion to suppress is reviewed under two standards:  factual findings are examined for clear error and legal conclusions de novo.  United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006). Wright challenges the district court's factual determination that he committed a traffic violation, arguing that the evidence presented at the suppression hearing undermined the troopers' credibility and consequently there was insufficient evidence that he did not stop.  He contends that because he actually stopped at the stop sign the troopers lacked probable cause, and his detention therefore violated the Fourth Amendment.

---

[2]The Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska.

To support his argument that his constitutional rights were violated Wright cites City of Indianapolis v. Edmond, 531 U.S. 32 (2000), and United States v. Yousif, 308 F.3d 820 (8th Cir. 2002). Both decisions examined the constitutionality of drug checkpoints, and in each case the checkpoint was found to have violated the Fourth Amendment.

Like the instant case, the checkpoints in Edmond involved signs that were intended to intercept motorists transporting illegal drugs, see 531 U.S. at 34–36, but other aspects were different. At each checkpoint in Edmond the police stopped a predetermined number of vehicles. Pursuant to a written set of procedures, an officer would approach a car and ask for license and registration, look for signs of impairment, and examine the interior of the car. A drug dog conducted a canine sniff of every stopped car. If consent to search was not obtained and particularized suspicion did not develop, the officer would let the motorist leave. Id. at 35. The primary purpose of the checkpoints was to "uncover evidence of ordinary criminal wrongdoing." Id. at 42. The Supreme Court held that the checkpoints violated the Fourth Amendment stating:

> The primary purpose of the Indianapolis narcotics checkpoints is in the end to advance the "general interest in crime control." We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.

Id. at 44 (internal citation omitted).

Signs indicating the presence of a drug checkpoint were also used as a ruse in Yousif to induce motorists to exit the freeway. 308 F.3d at 823. All motorists who

left the interstate after the posted signs were stopped at a drug interdiction checkpoint located at the top of the exit ramp. The officers asked for a driver's license, vehicle registration, and proof of insurance. They also recorded the license plate number and asked drivers why they had exited the interstate. If illegal activity was perceived, the officers questioned the driver more extensively. If the officers developed a reason to believe that the vehicle contained contraband, they asked for consent to search. If consent were denied but the officer still had a reasonable suspicion that the occupants were involved in unlawful activity, a drug dog was deployed for a canine sniff. If the dog did not alert and the officer had no other reason to hold the vehicle, the motorist would be allowed to leave. Id. at 823–24. We held that this program violated the Fourth Amendment "insofar as its primary purpose was the interdiction of drug trafficking . . . and the officers . . . were under instructions to stop every vehicle" that took the exit. Id. at 827. We noted that "while some drivers may have wanted to avoid being caught for drug trafficking, many more took the exit for wholly innocent reasons . . . . General profiles that fit large numbers of innocent people do not establish reasonable suspicion." Id. at 827–28.

In two of our subsequent cases which had similar facts as those before us now, no Fourth Amendment violation was found. In both cases signs on the freeway indicated a checkpoint ahead even though none actually existed, and not every exiting motorist was stopped. See United States v. Williams, 359 F.3d 1019 (8th Cir. 2004); United States v. Martinez, 358 F.3d 1005 (8th Cir. 2004). In both of those cases a ruse drug checkpoint was set up by placing signs warning of a drug checkpoint ahead to induce motorists to exit the freeway before reaching the checkpoint. Williams, 359 F.3d at 1020; Martinez, 358 F.3d at 1006–07. Officers would then stop only those exiting vehicles which committed a traffic violation. In holding that this practice did not violate the Fourth Amendment we distinguished Edmond and Yousif:

Edmond and Yousif involved the use of actual checkpoints at which motorists were stopped regardless of whether they had committed a

traffic violation.  Here, there was no checkpoint on the . . . exit, and motorists who took the exit were not stopped unless they were observed committing a traffic violation.  Given this distinction, <u>Edmond</u> and <u>Yousif</u> are not controlling.

<u>Martinez</u>, 358 F.3d at 1008–09; <u>see also</u> <u>Williams</u>, 359 F.3d at 1021.

Wright's case is like <u>Williams</u> and <u>Martinez</u> and different from <u>Edmond</u> and <u>Yousif</u>.  Here, no checkpoint actually existed, unlike in <u>Edmond</u> and <u>Yousif</u>, and the troopers did not stop all vehicles or a predetermined number of them.  Under the checkpoint plan in this case, like in <u>Williams</u> and <u>Martinez</u>, troopers were only to stop vehicles for which they had individualized suspicion of a traffic violation.  In these circumstances use of a ruse checkpoint did not violate Wright's constitutional rights.

Wright argues nevertheless that the traffic stop of his pickup was unreasonable.  Because a traffic stop is a seizure within the meaning of the Fourth Amendment, <u>see</u> <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979), it must be reasonable to pass constitutional muster, <u>see</u> <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996).  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  <u>Whren</u>, 517 U.S. at 810.  "Any traffic violation, however minor, provides probable cause for a traffic stop."  <u>United States v. Bloomfield</u>, 40 F.3d 910, 915 (8th Cir. 1994) (en banc).  An otherwise constitutional traffic stop is not invalidated by the fact that it was "mere pretext for a narcotics search."  <u>United States v. Williams</u>, 429 F.3d 767, 771 (8th Cir. 2005), <u>citing</u> <u>Whren</u>, 517 U.S. at 812–13.  It is a violation of Nebraska law to fail to stop at a stop sign.  Neb. Rev. Stat. § 60-6,148; <u>see</u> Neb. Rev. Stat. § 60-667 (definition of a stop).

Wright argues that there was insufficient evidence to support the district court's finding of a traffic violation and that the troopers lacked probable cause to stop him.  He contends that he produced evidence to negate any evidence of a violation.

Specifically he argues that his witness Craig Sutton undermined the credibility of the troopers, as did the video taken from Scott's patrol car and the failure to tape the traffic violation or to record the subsequent conversations. The government argues that there is sufficient evidence to support the district court's finding of a traffic violation. There were two versions of the facts, and the district court chose to believe the troopers' testimony; the court's credibility determinations require a high degree of deference.

At the evidentiary hearing the magistrate judge heard testimony from Hand, Probasco, and Craig Sutton, a mechanic employed by Wright. The troopers both testified that Wright signaled a right hand turn but failed to come to a complete stop at the sign at the top of the exit ramp. Wright contends that the troopers' testimony is not credible because the turn signal on his pickup did not work that evening. He called Sutton to testify that the truck's right turn signal had been broken before June 2, 2005 and was still not working at the time of the evidentiary hearing. The magistrate judge heard all the evidence and expressly stated that he did "not find the testimony of Mr. Sutton credible"; he also noted that Sutton was employed by Wright and stood to lose his job should Wright be convicted. Hand's admission that the back right tail light of Wright's vehicle was damaged at the time of the stop did not address the front right turn signal. As to Wright's contention that the troopers could not see the stop sign from their vantage point, the district judge found that the video from Scott's patrol car did not corroborate Wright's argument.

Wright also argues that the troopers' failure to videotape the traffic violation and properly to record their conversations with Wright undermines the credibility of their testimony. In accordance with their training, the troopers activated the videotape recording when they initiated the traffic stop after witnessing a violation. The government's evidence indicated that the troopers did make audio recordings of their conversation with Wright; the fact that the recordings are of poor quality did not require the district court to draw an adverse credibility finding.

The lower court made credibility judgments based on the testimony and presentation of the witnesses, and it believed the troopers' testimony which supported the finding that Wright did not stop at the stop sign. We give great deference to a lower court's credibility determinations because the "assessment of a witness's credibility is the province of the trial court." United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995). We conclude that sufficient evidence existed to support the finding that Wright did not come to a complete stop at the sign. The troopers therefore had probable cause for the traffic stop.

For the foregoing reasons we affirm the judgment of the district court.

_____