# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2666

_____

United States of America,        *
                                  *

           Appellee,       *

                                * Appeal from the United States
      v.                   * District Court for the
                                * District of Nebraska.

Noe Gustavo Chavez Loya,    *
also known as Gordo,        *
also known as Pico,         *
                                *

           Appellant.      *

_____

Submitted: December 12, 2007
Filed: June 5, 2008

_____

Before LOKEN, Chief Judge, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Noe Gustavo Chavez Loya ("Loya") was indicted on one count of knowingly and intentionally possessing "list I chemicals [ephedrine and pseudoephedrine], knowing and having reasonable cause to believe the list I chemicals would be used to manufacture . . . methamphetamine." See 18 U.S.C. § 2; 21 U.S.C. § 841(c)(2). Loya moved to suppress evidence seized during a vehicle search. The district court[1] denied

_____

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska, adopting in part the report and recommendations of the Honorable David

the motion, and Loya pled guilty to the charge while reserving his right to appeal the suppression issue. Loya now raises that issue on appeal. We affirm.

## I.

On the morning of February 14, 2006, Nebraska State Patrol Trooper Andy Allen constructed a ruse drug checkpoint at the Giltner interchange, Exit 324, on Interstate 80 in Hamilton County, Nebraska. The Giltner interchange consists of a single-lane on- and off-ramp in each direction. The trooper set up signs just west of the interchange, indicating that there was a drug checkpoint ahead that, in reality, did not exist. Other than the ruse checkpoint, exit, and mile marker signs, there were no other signs located there. Trooper Allen characterized the Giltner exit as a "dead interchange," and, according to the magistrate judge,

> The Giltner exit, Exit 324, is essentially a local road. There are no services of any kind at that exit. At the end of the exit ramp is a stop sign at its intersection with State Spur 41-B, otherwise known as the "Giltner Spur." Three miles to the south is the village of Giltner, in which there are no restaurants or gas stations or lodging accommodations. To the immediate north and south of the exit are farmhouses. . . . State Spur 41-B leads north approximately three miles to state Highway 34, an east-west, two-lane paved roadway. Twelve miles west of this exit is Exit 312, the principal exit for Grand Island, Nebraska, at which there is a full range of services, including lodging, fuel, and restaurants. Between the two exits is a rest area for eastbound traffic at mile marker 315. Hence, the Giltner exit is utilized primarily, if not solely, by "local" traffic.

Appellee's Addendum at 2.

---

L. Piester, United States Magistrate Judge for the District of Nebraska.

At 9:30 a.m., Trooper Allen was stationed in his marked patrol car to the south of the Giltner exit ramp facing east near some trees, so his car was not visible to motorists exiting there. There is a stop sign located at the end of the off-ramp, and Trooper Allen's location provided him a clear view of the stop sign. Trooper Allen did not observe any vehicles leave the interstate via the Giltner exit until 10:15 a.m., at which time he observed two vehicles doing so. The first vehicle was a small red car, and the second was a small black car. Trooper Allen could not see the red car's license plates because the black car was following so closely that it appeared that "the red one was towing the black one." The trooper was able to see that the black car had Arizona plates. The red car rolled through the stop sign at the end of the off-ramp, turned left onto State Spur 41-B, and continued north over the overpass, while the black car made a complete stop and also turned left, continuing to follow the red car.

Trooper Allen decided to stop the red car for running the stop sign and the black car for following too closely and followed the cars northbound on State Spur 41-B. During this time, the trooper again observed the black car following at too close a distance behind the red car. The vehicles reached Highway 34, stopped at the stop sign and turned left, proceeding west on Highway 34. At that point, Trooper Allen attempted to execute a "double stop" and activated his in-car video camera. Trooper Allen pulled up beside the black car, gestured to its driver to follow him, pulled in front of the black car, activated his lights, and again gestured to the black car to pull over. However, only the red car pulled over to the shoulder, and Trooper Allen pulled in behind it. The black car continued west on Highway 34.

Trooper Allen exited his patrol unit and approached the red vehicle, a Toyota Camry, on the passenger side. There were two occupants, the driver, Loya, and the passenger, Jose Lopez Loya ("Lopez"). Allen first spoke to Loya and asked to see his driver's license and the registration for the vehicle. Loya told the trooper that he did not have a license. Lopez, who had no identification with him, retrieved the registration from the glove compartment and gave it to the trooper. The trooper asked

who the owner of the vehicle was, and Lopez stated that the owner was "Juan." However, the car was registered to a different person, Geraldo Perez, in San Jose, California. Trooper Allen asked where the owner was, and Lopez stated that he did not know. Loya and Lopez said that they had borrowed the car for the trip. Trooper Allen requested, in English, that Loya come back to the patrol car, and Loya complied with the request. In the patrol vehicle, Loya stated that he had a Mexican driver's license but he did not have it with him and that he did not have a United States license. Loya also stated that "he was on his way to the state capitol of Nebraska, Omaha . . . ." Trooper Allen began completing the warning for the failure to stop and the violation card for Loya having no driver's license and telephoned another trooper nearby to ask him to look for the black car.

Then, Trooper Allen returned to the Camry and talked with Lopez about the trip. Lopez stated that he and Loya had been snow boarding in Wyoming for five days. When the trooper asked Lopez why they had left the interstate and then turned back west on Highway 34, he stated that "they just wanted to drive around for a little bit." Trooper Allen then asked whether the black vehicle had been traveling with them, and Lopez responded that it had. The trooper then asked Lopez if there were any guns or drugs in the Camry, and Lopez responded that there were not. Trooper Allen then asked for permission to search the vehicle, and Lopez stated that the trooper could do so. When Trooper Allen made the request, 19 minutes had elapsed since the trooper made the stop. Trooper Allen's conversation with Lopez was carried out in English, and the trooper testified that Lopez spoke English well and exhibited no difficulty in conversing. The trooper described Lopez as "laid back," friendly, and cooperative.

At that point, the trooper returned to his patrol car and finished completing the warning and violation card for Loya and had him sign the card. The trooper also talked to Loya about making complete stops at stop signs and obtaining a United States driver's license. Trooper Allen did not hand the completed paperwork to Loya

-4-

and proceeded to ask him one-word questions: "pistolas?" and "drugas?" Loya responded either "no" or "nada," meaning nothing, each time. Trooper Allen testified that he and Loya communicated through hand signs as well as the trooper's poor Spanish and Loya's poor English. After a few minutes delay, during which Trooper Allen made a phone call, the trooper repeated the one-word questions, and Loya again responded in the negative to each question. Then the trooper, in an attempt to seek permission to conduct a vehicle search, asked, while gesturing to the vehicle, "[w]ould you give me escuchar?"[2] Trooper Allen testified that Loya "gesture[d] toward . . . and . . . point[ed] at the passenger . . . ." Allen took this to mean that he needed to ask Lopez for permission to search the vehicle. The trooper testified that, when he informed Loya that Lopez had already consented, Loya nodded his head. During this conversation, Loya exhibited signs of nervousness and appeared "scared to death" such that Trooper Allen believed that Loya wanted the trooper to leave Loya alone and go talk to Lopez.

Trooper Allen then went to the passenger side of the Camry again and requested that Lopez exit the vehicle and Lopez did so. The trooper asked Lopez whether he had any weapons on his person and checked Lopez's waistband for weapons. Trooper Allen approved of Lopez's request to sit on the shoulder of the highway while the trooper conducted the vehicle search. When the trooper opened the trunk, he saw a

---

[2]According to the district court,

The word "escuchar," . . . is the infinitive form of a Spanish verb that means "to listen" or "to heed" in English. . . . [A]ssum[ing] that [Loya] understood the English portion of the trooper's question, and . . . assum[ing] that the trooper used the  word "escuchar" to request permission to search . . ., [Loya] would have heard the trooper ask, literally, "Would you give me to listen?" or "Would you give me to heed?" while gesturing toward the defendants' car.

Appellant's Addendum at 48-49.

blue nylon bag and asked Lopez whose bag it was. Lopez stated that it was Loya's bag. The trooper opened the bag and observed miscellaneous clothes and a 10-inch by 2-inch box of Ziplock baggies. The trooper then looked through a black nylon travel bag that Lopez said was his. Under the two bags, the trooper found a speaker box. When Trooper Allen lifted the speaker box, he felt something shift inside of it and found ephedrine and pseudoephredine pills, precursors for the production of methamphetamine. After finding the pills, the trooper called for Immigration and Customs Enforcement (ICE), to help conduct interviews. While Trooper Allen carried out the search, neither Lopez or Loya made any effort to stop the search or said anything while the search was conducted. Both Loya and Lopez were arrested.

On February 24, 2006, Loya was indicted for knowingly and intentionally possessing "list I chemicals [ephedrine and pseudoephedrine], knowing and having reasonable cause to believe the list I chemicals would be used to manufacture . . . methamphetamine." See 18 U.S.C. § 2; 21 U.S.C. § 841(c)(2). Loya moved to suppress the evidence obtained in the vehicle search. Following the evidentiary hearing on the motion to suppress on June 5, 2006, the magistrate judge issued his Report, Recommendation, and Order, recommending that the motion be denied in all respects because: (1) the initial stop was valid based on Loya's failure to stop; (2) the trooper was justified in further detaining Loya and Lopez once the citation and warning had been completed because he was reasonably suspicious that criminal activity was afoot; (3) Lopez consented to the search of the vehicle; and (4) despite the fact that Loya's responses to the trooper were not explicit and the considerable language barrier that existed between them, the trooper reasonably believed that Loya consented to the search.

Loya filed timely objections to the magistrate judge's recommendation, challenging the finding that the initial stop was lawful and that Loya consented to the search. The district court agreed that Loya's purported consent was invalid because the trooper used the incorrect Spanish term for requesting permission to search;

however, the court adopted the remainder of the magistrate judge's report and denied the motion to suppress because, finding that: (1) the initial traffic stop was lawful and (2) the search of the vehicle was lawful in view of Lopez's voluntary consent to the search because he had at least joint control over the vehicle and the trooper reasonably believed that Lopez had authority over the vehicle.

Loya filed a "Motion to Reopen and to Assert Objections to the Report and Recommendation Concerning Suppression Issues" asserting five objections: (1) the trooper unlawfully expanded the duration and scope of the stop; (2) Loya did not consent to the search of the vehicle;[3] (3) Lopez's consent to the search of the vehicle was not valid; (4) Lopez's consent, if valid, did not extend to the search of Loya's blue bag; and (5) Loya's conduct after the search began did not amount to consent or "ratification" of the search.[4] The district court determined that Loya forfeited a Fourth Amendment challenge to the trooper's search of the blue bag by failing to raise it until the motion to reopen. The court further concluded that Loya had failed to show that, despite the forfeiture, review was warranted where: (1) he had not explained why the objection could not have been have made earlier and (2) the search yielded items inconsequential to Loya's prosecution.

With respect to Loya's argument that the stop was unconstitutionally expanded in time and scope, the district court first noted the lack of a timely objection to the magistrate judge's contrary finding. The court then went on to find that the trooper did not expand the scope or duration of the stop until he had a reasonable suspicion of criminal activity. With regard to Loya's argument that Lopez's consent did not provide a valid basis for the search of the vehicle, the district court noted that the

---

[3]The district court noted that this issue had already been decided in Loya's favor.

[4]The district court disposed of the ratification argument as irrelevant because Loya's consent was not the basis for the court's denial of the motion to suppress.

voluntariness of Lopez's consent was not at issue and that it had already found that Lopez had at least joint control over the vehicle such that a reasonable officer would be justified in his belief that Lopez had authority to permit the search of the vehicle. Furthermore, the district court recognized that Loya had conceded that "[n]o good faith argument based on these undisputed facts can be made that [Lopez] lacked common authority to consent to a search." Appellant's Addendum at 60. In light of the finding that the stop was not unconstitutionally prolonged in time or expanded in scope, the district court denied Loya's request for leave to challenge the validity of Lopez's consent on those grounds. Accordingly, the district court denied the motion to reopen. On April 2, 2007, Loya pled guilty, reserving the right to appeal the district court's denial of the motion to suppress and the motion to reopen. On July 9, 2007, the district court sentenced Loya to a term of 135 months in prison and 3 years of supervised release with special conditions. Loya brings this appeal.

II.

Loya concedes the validity of the initial stop of the vehicle for the failure to stop at a stop sign. However, Loya contends that: (1) the trooper violated the Fourth Amendment because he expanded the scope of the traffic stop and extended its duration by asking questions about contraband and requesting permission to search the vehicle without reasonable suspicion of criminal activity; (2) Lopez's consent was insufficient to justify the vehicle search because it was involuntary in light of the unconstitutional scope and duration of the stop and Lopez lacked either actual or apparent authority over the vehicle; and (3) the trooper's search of the blue bag, with knowledge that it belonged to Loya, violated the Fourth Amendment.

> In considering an appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal determinations de novo. We are required to affirm the district court's denial of a motion to suppress "unless it is unsupported by substantial

evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made."

United States v. Stachowiak, 521 F.3d 852, 854 (8th Cir. 2008) (internal citation omitted) (quoting United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995)).

III.

Loya concedes that the detention was legitimate until Trooper Allen asked questions about guns and drugs. See United States v. Wright, 512 F.3d 466, 471 (8th Cir. 2008) (stating that any traffic violation, including the failure to stop, provides probable cause for a stop); see also Neb. Rev. Stat. § 60-6,148 (providing that it is a violation of Nebraska law to fail to stop at a stop sign). The trooper first posed the guns-and-drugs questions to Lopez, while Loya remained in the patrol car and the trooper retained the paperwork associated with the traffic stop. Trooper Allen then returned to the patrol car and asked Loya a series of one-word questions aimed at determining whether the vehicle contained contraband and also purported to request permission to search the vehicle. At that point, Trooper Allen had completed the paperwork associated with the traffic violation but had not yet handed it to Loya and had not told Loya that he was free to leave. The government implicitly concedes that the trooper's questioning as to whether Lopez and Loya were transporting contraband expanded the scope of the stop beyond the traffic violation and prolonged their detention but contends that such questioning was warranted in light of the trooper's reasonable suspicion of criminal activity. Assuming for purposes of this appeal only that the government's concession is correct, Trooper Allen had reasonable suspicion justifying any expansion of the stop or extension of its duration.

An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot. See

United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007) ("If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic offense.'" (quoting United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994) (en banc)). In determining whether Trooper Allen's observations during the course of the stop rise to an objectively reasonable suspicion of criminal activity, we examine the totality of the circumstances in light of the trooper's experience. United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002). Under this approach, reasonable suspicion may exist even if "each factor giving rise to suspicion might appear to be innocent when viewed alone . . . ." Linkous, 285 F.3d at 720. "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." Lyons, 486 F.3d at 371 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).

In this case, the circumstances known to the trooper when he questioned Lopez and Loya about guns-and-drugs and sought permission to search the vehicle were that: the vehicle exited the interstate at a ruse checkpoint, see United States v. Carpenter, 462 F.3d 981, 987 (8th Cir. 2006), cert. denied, 127 S. Ct. 2029 (2007) (exiting just after checkpoint signs may be considered as one factor in the totality of circumstances, although, standing alone, it is not a sufficient basis to justify a seizure); several exits prior to the ruse checkpoint possessed a full range of services, while it had none; the vehicle was being followed too closely by the vehicle traveling with it; the vehicle was not local; after exiting the interstate, the vehicle drove north to Highway 34 and turned west, the opposite direction from its travel direction; though the two vehicles were traveling together and the trooper attempted to execute a double stop, the black car did not stop; when the trooper asked Lopez why they had left the interstate, he stated that "they just wanted to drive around for a little bit;" Loya had no license; the vehicle did not belong to Loya or Lopez; Lopez indicated that the owner of the vehicle was someone named Juan, but the registration listed Geraldo Gonzales as the owner,

<u>see</u> <u>id.</u> (stating that a "discrepancy between documents and a driver's explanation is a legitimate basis for suspicion"); Gonzales was not present and neither Loya or Lopez knew where Gonzales was; Lopez had no identification; and Loya appeared nervous.

Under the totality of the circumstances, Trooper Allen, with 16 years experience as a traffic officer, possessed more than a "hunch" that criminal activity was afoot. <u>See</u> <u>Sokolow</u>, 490 U.S. at 7. Rather, he had reasonable suspicion to expand the scope of the stop and prolong its duration in order to investigate the potential presence of contraband. Furthermore, assuming that Trooper Allen's questioning constituted a "broadened inquiry [that] must be reasonable," <u>United States v. Ward</u>, 484 F.3d 1059, 1062 (8th Cir. 2007), in that "[t]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." <u>Id.</u> (quoting <u>Bloomfield</u>, 40 F.3d at 916), his approach was "a minimally intrusive way of addressing his reasonable suspicion . . . ." <u>United States v. Donnelly</u>, 475 F.3d 946, 953 (8th Cir. 2007).

Next, Loya challenges the search itself,[5] asserting that it cannot be justified based on Lopez's consent because (1) it was not voluntarily given where Lopez was not advised of his ability to refuse consent and his consent came after the trooper asked questions unrelated to the basis of the stop and unconnected to any reasonable suspicion to expand the scope of the stop and (2) Lopez lacked both actual and apparent authority over the vehicle. Assuming that neither of these contentions have been forfeited, both fail. We reject Loya's first assertion because we have already disapproved of its premise, finding instead that Trooper Allen had reasonable suspicion to expand the scope of the stop.

---

[5]We assume, without deciding, that: (1) as the district court found, Loya's consent was not effective and (2) as is implicit in the district court opinion, Loya had a sufficient interest in the vehicle to raise a Fourth Amendment challenge to the search.

With regard to Loya's second contention, a vehicle search pursuant to voluntary consent from a third party with authority over the vehicle does not violate the Fourth Amendment. See Illinois v. Rodriguez, 497 U.S. 177, 181, 185-86 (1990); United States v. Matlock, 415 U.S. 164, 171 (1974).

> Valid third party consent can arise either through the third party's actual authority or the third party's apparent authority. A third party has actual authority to consent to a search if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes. . . . [A] third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent.

United States v. Andrus, 483 F.3d 711, 716 (10th Cir. 2007), cert. denied, 128 S. Ct. 1738 (2008) (internal quotation and citation omitted) (citing Georgia v. Randolph, 547 U.S. 103 (2006)). Consistent with the notion of common authority as defined by the Supreme Court in Matlock, 415 U.S. at 171 n.7, a passenger may have common authority to consent to a full search of a vehicle. United States v. Morales, 861 F.2d 396, 400 n.9 (3d Cir. 1988); see United States v. Poulack, 236 F.3d 932, 934-36 (8th Cir. 2001) (holding that passenger, who rented the vehicle, had authority to consent to search); United States v. Hammons, 152 F.3d 1025, 1027 (8th Cir. 1998) ("[B]ecause the car was rented in [the passenger's] name, she had authority to consent to its search.").

In determining whether Lopez had such authority, "[t]he relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that [Lopez] had authority over the [vehicle]." United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997) (citing Rodriguez, 497 U.S. at 188); see United States v. Botchway, 433 F. Supp. 2d 163, 169 (D. Mass. 2006) (finding it reasonable for trooper to conclude that passenger had authority to consent to the search of the car because the driver stated that he did not know to whom the car belonged, did not produce a registration for the vehicle, passenger said that the vehicle belonged to his

girlfriend, and no other occupant objected to the search); United States v. Ospina, 682 F. Supp. 1182, 1185-86 (D. Utah 1988) (holding that a passenger had common authority over a vehicle where he exhibited "particular knowledge about the car and its control or dominion" by responding to an officer's request to a vehicle's occupants by opening the glove box and retrieving the registration; answering officer's questions about a sticker on the car window; and providing the keys to the officer to search the trunk).

In this case, it was the passenger, Lopez, who, upon Trooper Allen's request, opened the glove box and removed the registration without any help or direction from Loya. Lopez was also the one who responded to the trooper's question about the vehicle's ownership, while the defendant remained silent. Also, when Trooper Allen asked Lopez for permission to search the car, Loya gestured toward Lopez which the trooper took to mean that Loya wanted him to request permission from Lopez. Under the circumstances of this case, it was reasonable for Trooper Allen to believe that Lopez had common authority to consent to a search of the entire vehicle, including the trunk. Moreover, according to Loya, he cannot, in good faith, dispute that Lopez had common authority to consent to the search. Appellant's Addendum at 60. In addition, even assuming Randolph is applicable in the context of a jointly occupied vehicle, but see Rakas v. Illinois, 439 U.S. 128, 148 (1978) ("We have on numerous occasions pointed out that cars are not to be treated identically with houses or [a]partments for Fourth Amendment purposes."), Loya's reliance on Randolph is misplaced because Loya has admitted that he did not expressly refuse consent. Appellant's Brief at 27; see Randolph, 547 U.S. at 120 ("We therefore hold that a warrantless search of a shared dwelling for evidence over the *express* refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another." (emphasis added)).

Finally, Loya challenges Trooper Allen's search of the blue bag. Loya first raised this contention in his motion seeking leave to reopen his objections to the

magistrate judge's report and recommendation; the district court declined to address the matter and denied the request to reopen. We review the district court's denial of the motion to reopen the suppression issue for abuse of discretion. <u>Gill</u>, 513 F.3d at 846; <u>United States v. Johnson</u>, 944 F.2d 396, 403 n.5 (8th Cir. 1991). With no indication from Loya as to (1) why his objection to the search of the blue bag could not have been raised earlier or (2) how the inclusion into evidence of the items found in the search of the blue bag prejudiced him where the drugs which are the subject of his conviction were found elsewhere, the district court did not abuse its discretion in denying Loya's request.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____