# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-2137
_____

United States of America

*Plaintiff - Appellee*

v.

Kelly Ray Barber

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa - Ft. Dodge
_____

Submitted: February 14, 2014
Filed: May 29, 2014
[Unpublished]
_____

Before SMITH, BEAM, and BENTON, Circuit Judges.
_____

PER CURIAM.

Kelly Ray Barber appeals the district court's[1] denial of his motion to suppress evidence after conditionally pleading guilty to possession with intent to distribute

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

more than five grams of actual methamphetamine after having been previously convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 851. We affirm.

## I. *Background*

On October 11, 2012, around 9:00 p.m., Officer Joel Vandekrol of the Clear Lake Police Department observed a vehicle pull up near where he was parked. Officer Vandekrol testified that it came through an alley with its lights off, turned right, and parallel parked on the street. After this vehicle aroused his suspicions, Officer Vandekrol began watching the vehicle and a nearby house. He was familiar with that particular house because the owner's name had "come up several times" regarding drug activity and short-term vehicle traffic. The Clear Lake police had previously done surveillance on the house.

Officer Vandekrol could not see how many people were in the vehicle when it initially pulled up. He testified that he was 30 to 50 yards away, there were "no street lights anywhere close," and it was a "very shaded area." He saw two people exit the vehicle and enter the house. Officer Vandekrol testified that these individuals were wearing big winter coats with hoods and baggy clothing. Officer Vandekrol was unable to tell the gender of the people who exited the vehicle or determine their age, height, or weight.

Officer Vandekrol then drove his squad car past the vehicle to get its license plate number. He checked the plates and learned that the registered owner of the vehicle—a female—had a "surrendered" driver's license. Officer Vandekrol explained that a surrendered license could mean that the person was forced to give it up by the Department of Transportation due to a medical condition or that the person may have moved out of the state and obtained a driver's license in another state. After receiving information about the vehicle's owner, Officer Vandekrol repositioned his squad car

-2-

so that he could observe the vehicle while remaining out of sight of the house's occupants. Officers James O'Keefe and Bengston[2] soon arrived to provide backup.

At approximately the same time that Officers Bengston and O'Keefe arrived near the area, Officer Vandekrol observed the vehicle's brake lights come on and the vehicle begin to move back down the alley, again with its lights off. Officer Vandekrol testified that it was "too dark from my position" to see the driver walk back out of the house, and, at that point, he did not know how many people were in the vehicle. When the vehicle turned onto the paved street, the driver turned on the vehicle's lights. Officers Bengston and O'Keefe stopped the vehicle approximately three or four blocks from where Officer Vanderkrol first observed it. Officer O'Keefe testified that before stopping the vehicle, Officer Bengston "made a comment that he thought he saw a vehicle leaving down the alley way without any lights on."

Officer Vandekrol testified that he did not know who was driving the vehicle until Officers Bengston and O'Keefe stopped it. Similarly, Officer O'Keefe testified that he did not know that the driver of the vehicle was male[3] until after the officers stopped the vehicle, Officer O'Keefe approached the driver's window, and Barber looked up at him. Barber did not have a driver's license with him and identified himself by name. Officer Bengston knew that Barber had a barred license, a fact that Barber confirmed. The officers arrested Barber, searched the car, and recovered methamphetamine from the car.

---

[2]The record does not reveal Officer Bengston's first name; additionally, the transcript from the suppression refers to the officer's name as "Bengtson." For consistency with the magistrate judge's report and recommendation, we will refer to the officer as "Bengston."

[3]A video recording of the stop was introduced as Government's Exhibit 1. The video confirms that the driver's gender is not readily apparent—even after Barber gets out of the car—because of a heavy, loose-fitting coat and a hood that extends beyond the person's face.

Officer Vandekrol's police report states that the vehicle left the area in the alley with its lights off; however, Officer Vandekrol conceded on cross-examination that the police report does not state that the vehicle also arrived at the house with its lights off. Officer Vandekrol, who had been a police officer for approximately 15 months prior to this incident, testified that he does not "mention every probable cause" when preparing his report. Officer Vandekrol believed that the vehicle driving off without lights constituted a traffic violation, but he also advised Officer O'Keefe on the radio that "there's no DL on file; so that's your PC if you want to go get 'em."

Barber called Bret Palmer, the service manager at a local Chevy dealership, to testify as an expert witness. Palmer testified that he checked the VIN number on the 1997 Chevy Lumina, which was involved in the incident, and determined that it had an "automatic headlamp." This means that the headlights come on when the engine is running. Palmer explained that you cannot override the system, unless there is a mechanical problem. But, on further examination, Palmer agreed that some vehicles of this make and model have one light, while others have two bulbs. Palmer could not tell from the VIN whether the car that Barber was operating had one light or two. On those cars that have both "running lamps" and "headlights," the running lamps are on all the time, with a switch manually controlling the headlights. On cross-examination, Palmer testified that he "assumed" that a fuse controlled the running lights, and he conceded that it was "possible" that one could disable the running lights by pulling the fuse.

Frank Hodak, a Cerro Gordo County sheriff's deputy assigned to the North Central Iowa Narcotics Task Force, testified on rebuttal that when running cover operations, it was common for task force officers to disable a vehicle's daytime running lights. Deputy Hodak explained that on approximately ten occasions either he or a person at the dealership disabled the daytime running lights by pulling a fuse. This was done on a variety of makes and models. Deputy Hodak testified that he had personally disabled the running lights on a Chevy Trailblazer using this method, but

he acknowledged on cross-examination that he had no knowledge regarding the Chevy Lumina that Barber was driving.

Barber was charged with one count of possession with intent to distribute more than five grams of actual methamphetamine after having been previously convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 851. He initially pleaded not guilty and filed a motion to suppress seized evidence during the traffic stop.

Following an evidentiary hearing and briefing, the magistrate judge issued a report and recommendation to the district court recommending denial of the motion to suppress. The magistrate judge found that the officers had probable cause to stop Barber based on a traffic violation—driving in an alley without headlights. In making this finding, the magistrate judge rejected Barber's argument that Officer Vandekrol was not credible because of his failure to include in the police report that Barber arrived at the scene with the vehicle's lights off. The magistrate judge "found Vandekrol to be a credible witness" and explained that in Officer Vandekrol's report, which he prepared shortly after the events, he noted that the vehicle left the area with its lights off. The magistrate judge also noted that, before the stop, Officer Bengston commented to Officer O'Keefe that he "thought he saw a vehicle leaving down the alley way without any lights on." Based on this testimony, the magistrate judge concluded that "Vandekrol's failure to note in his report that the vehicle also arrived with no lights, does not make the testimony regarding the lack of lights when leaving any less credible."

Alternatively, the magistrate judge found that the officers had reasonable suspicion to believe that the driver of the vehicle was an unlicensed driver, which also supported the traffic stop. The magistrate judge found that the video of the stop "confirms that the driver's gender is not readily apparent—even after he gets out of the car—because of a heavy, loose-fitting coat, and a hood which extends beyond the

person's face." The court again credited Officer Vandekrol's testimony, as well as Officer O'Keefe's testimony.

Barber *filed no objections* to the report and recommendation, and the district court adopted the report and recommendation and denied the motion to suppress.

## II. *Discussion*

Barber argues that the evidence and testimony offered at the suppression hearing were insufficient to justify the stop of the vehicle. According to Barber, even if this court applies plain-error review, "serious and readily apparent credibility issues" exist as to Officer Vandekrol. He maintains that "[t]he inconsistencies and differing accounts of the events that transpired on the night of October 11, 2012[,] are untenable to validate the motor vehicle stop of [him]." He contends that Palmer's testimony showed that the allegations that Barber was operating the vehicle without headlamps "was a preposterous creation of imagination to support an illegal and constitutionally defective stop of the defendant's vehicle."

Because Barber filed no objections to the magistrate judge's report and recommendation, the factual conclusions underlying Barber's appeal are reviewed for plain error. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009) (citing *United States v. Newton*, 259 F.3d 964, 966 (8th Cir. 2001); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998)). We review the district court's "conclusion as to whether the search violated the Fourth Amendment . . . de novo." *Newton*, 259 F.3d at 966.

Barber's entire appeal is based on his challenge to Officer Vanderkrol's credibility, as he does not dispute the district court's probable-cause legal analysis. Here, the magistrate judge found Officer Vandekrol's testimony credible. Officer Vandekrol testified that he saw Barber's vehicle moving in the alley without lights. The district court adopted the magistrate judge's report and recommendation,

-6-

including its determination that Officer Vandekrol was a credible witness. "A district court's findings regarding witness credibility are virtually unreviewable on appeal." *United States v. Coleman*, 700 F.3d 329, 334 (8th Cir. 2012) (quotations and citations omitted). Barber has shown no reason for us to second-guess the district court. We conclude that the district court did not plainly err in crediting the testimony of the officers that a traffic violation occurred; therefore, probable cause existed for the stop. *See United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) ("Any traffic violation, however minor, provides probable cause for a traffic stop." (quotation and citation omitted)).[4]

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____

---

[4]We also note that Barber *has not challenged* the district court's alternative conclusion that reasonable suspicion existed to support the traffic stop. An issue not raised on appeal is waived. *United States v. Simmons*, 964 F.2d 763, 777–78 (8th Cir. 1992). This unchallenged alternative holding also supports the district court's denial of the motion to suppress.