# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-3002

_____

United States of America

*Plaintiff - Appellee*

v.

Eric Christopher Vires

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: June 15, 2016
Filed: August 1, 2016
[Unpublished]

_____

Before SMITH and GRUENDER, Circuit Judges, and KETCHMARK,[1] District
Judge.

_____

PER CURIAM.

_____

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the
Western District of Missouri, sitting by designation.

Eric Christopher Vires conditionally pleaded guilty to possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). He appeals from the district court's[2] denial of his motion to suppress evidence obtained as a result of a traffic stop and vehicle search that he contends were illegal. We affirm.

## I. *Background*

At the hearing on Vires's motion to suppress, the government presented the testimony of Officer Jeremiah Covington, an officer with the North Little Rock Police Department (NLRPD). Officer Covington, an eight-year member of the NLRPD, has worked in the patrol division, investigations division, and narcotics division. Officer Covington was working in the narcotics division on July 10, 2012.

On that day, the NLRPD and the Drug Enforcement Administration were conducting a narcotics investigation involving Lesia Southerland, Vires's wife, and others. Officer Covington and other NLRPD officers performed surveillance at Southerland's place of employment in North Little Rock, Arkansas. Officers observed Southerland leaving the business in a car that Vires was driving. Officer Covington, in uniform, was selected to enter a marked patrol unit "to possibly stop a car that we were doing surveillance on in reference to a case." In describing the NLRPD's use of surveillance and a marked patrol unit, Officer Covington testified that "[t]ypically there's anywhere from five to ten unmarked units that will . . . circle around the area, try to identify the people that we're looking at to see if they are in the vehicles prior to doing a stop." According to Officer Covington, he generally "park[s] off the roadway somewhere and basically wait[s] on the call from the surveillance team on whether or not to make a stop."

---

[2]The Honorable Kristine G. Baker, United States District Judge for the Eastern District of Arkansas.

The patrol car that Officer Covington was driving was a "pool car"—"an older vehicle that's [extra and] unassigned." The pool car that Officer Covington was driving had "a [video] camera in the car, but it wasn't operational." While he admitted that "[i]t probably would have" "helped in this investigation if [his] video camera would have been working," he explained that the video camera was not working in the pool car because "the maintenance on [pool cars] is bare minimum." Officer Covington acknowledged that a pool car was used despite the investigation being "a pretty big narcotics investigation."

Officer Covington, in the marked patrol car, followed the vehicle that Vires was driving to a gas station north of Interstate 40 ("I-40") and then onto I-40 traveling west. Officer Covington testified that while he was following the vehicle, there were five unmarked vehicles "scattered all over" and that he stayed "within eyeshot" of the vehicle "until they made the call to actually initiate the stop." According to Officer Covington, at approximately 6:30 p.m., he reached the intersection of I-40 and Interstate 30 ("I-30") in North Little Rock where the vehicle that Vires was driving continued west on I-30. At this time, Vires's vehicle was in front of Officer Covington's car in the far lefthand lane of a three-lane highway. At approximately 15th Street in North Little Rock—prior to crossing over the Arkansas River into Little Rock, Arkansas—Officer Covington observed Vires's vehicle go "left of center." Officer Covington explained that he did not activate his blue lights immediately because there was no shoulder on the bridge or anywhere on that section of the interstate to initiate a safe stop, as Vires was traveling in the lefthand lane. Officer Covington was unable to say whether he activated his blue lights before or after crossing the Arkansas River but said that he was probably on the bridge, over the Arkansas River, when he did so. Officer Covington then initiated a traffic stop near 9th Street in Little Rock. Between Southerland's place of employment and 9th Street in Little Rock, Officer Covington followed the vehicle that Vires was driving for approximately 7.8 miles.

On further examination by defense counsel, Officer Covington testified that no one had to tell him to conduct the traffic stop because he is "a sworn officer" who "can make a stop at any time." But he admitted that "the judgment [to make the stop] was whoever the case officer or their designee was." He then agreed with the government that "[w]hether or not the traffic stop was going to be made," he did observe a traffic violation, and "whether or not for the investigational purposes [he] had the authority to make the stop," he otherwise possessed the authority as an NLRPD officer to make the traffic stop.

Officer Covington agreed that, at the time of the traffic violation, he knew that the vehicle that Vires was driving eventually would travel outside of his jurisdiction upon crossing over the bridge into Little Rock. But he testified that he had already witnessed the violation in his jurisdiction and that nothing requires him to make the stop in his jurisdiction.

After initiating the traffic stop, Officer Covington spoke to Vires, the vehicle's driver. Vires identified himself as "Scott Lang," an individual who had a suspended driver's license. Pursuant to NLRPD policy, anytime that an officer encounters a driver with a suspended license, the vehicle must be impounded. After running the license on "Scott Lang," Officer Covington asked Vires and Southerland to exit the vehicle. Officer Covington spoke to Vires and Southerland separately, and Southerland identified Vires as "Scott Schumacher."

Officer Covington testified that he then conducted an inventory search of the vehicle prior to towing and discovered a firearm, narcotics, and drug paraphernalia. He did not remember if he ran Southerland's license because, as the subject of the investigation, the officers knew her history and status. Officer Covington agreed that, at the time of the traffic stop and while he was discussing the vehicle search, Southerland said that the car was hers. Officer Covington stated that NLRPD policy does not provide that, if someone is driving with a suspended license, another driver

-4-

with a valid license may enter the car and leave. Officer Covington testified that he follows what the policy dictates—towing the vehicle if the driver has a suspended license. After conducting the inventory search, the vehicle was towed, and Vires and Southerland were transported to the detective division for questioning. At some point, Vires told the detectives his true identity.

Officer Covington's report states that he "was traveling on I-30 West at the 15th Street exit in the far left lane when [he] observed a vehicle in front of [him] veer outside the left lane of traffic." Officer Covington conceded that his report fails to mention the narcotics investigation or that he followed the vehicle that Vires was driving for over seven miles. He further admitted that his report fails to mention the unmarked units. None of the officers in the unmarked units were present to testify at the hearing. Officer Covington offered his report as a general report meant to memorialize the traffic violation and stop; it was not intended to incorporate the investigation's details.

Officer Covington also admitted that his report does not say anything about Vires crossing a center or yellow line. While Officer Covington referred to Vires going "left of center" on direct examination, he stated on cross-examination that he "never said center line" in the report; instead, he wrote in the report that the vehicle "veered outside of the left side of the traffic lane." He explained on redirect examination that "[n]ormally it would be left of center. But, obviously, there's no center l[i]ne . . . there. And the right side is considered a fog line, so it would be crossing left of the traffic lane, crossing the yellow line."

Officer Covington agreed that people tend to become nervous or intimidated when a marked patrol car is following them, but he did not agree that seeing a police car in the rearview mirror likely causes a traffic violation, such as swerving out of the traffic lane. His view is that people generally drive better in such circumstances because they know that a police officer is following them. He disagreed that the

investigation's purpose was to obtain a traffic stop for the purpose of searching for drugs. He claimed that the purpose of conducting a traffic stop during the investigation was to identify the vehicle's occupants other than Southerland, who was already under investigation. But he did state that "if something leads to where we inventory the vehicle or have a reason to search it, obviously we take that route."

In addition to Officer Covington, the government also presented Southerland's testimony. Southerland stated that she first noticed the police car following the vehicle when she saw blue lights in the rearview mirror while crossing over the Arkansas River bridge. Southerland said that she was not paying attention to how Vires was driving. Southerland testified that, during the traffic stop, Officer Covington asked Vires for consent to search the vehicle. She said that they "went back and forth" about searching the car. According to Southerland, Officer Covington then asked for her consent to search the vehicle, and she responded, "I don't care." Southerland claimed that the vehicle that Vires was driving belonged to her, but Vires disputed that claim.

Vires testified that he saw Officer Covington in a patrol car when he first pulled into Southerland's place of employment on July 10, 2012. Vires said that he knew a patrol unit was following him the entire time and "knew something wasn't right." He testified that Officer Covington followed more closely as they drove from I-40 to I-30 until Officer Covington turned on his blue lights three-quarters of the way over the Arkansas River bridge.

Vires denied committing any traffic violation on July 10, 2012. He testified adamantly that he did not cross the traffic line. He stated, "I'm a criminal. I know what he was doing. . . . [H]e was trying to get me to do something." According to Vires, during the traffic stop, Officer Covington asked for consent to search and told Vires and Southerland that, if he did not find anything during the search, he would permit Southerland to drive the car home. Vires testified that Southerland told Officer

-6-

Covington that the car was hers and that he could search the car. Vires disputed whether the car belonged to Southerland because, according to Vires, the car is not in her name.

Vires testified that he had no shoes on during the traffic stop because he had used his shoes to cover up the firearm in the car. After Officer Covington discovered the firearm, he asked Vires if had a concealed weapons permit or whether the firearm was stolen. According to Vires, he then admitted that he was a felon. Vires also admitted to lying about his identity in claiming to be "Scott Lang" and acknowledged instructing Southerland to lie about his identity, too. Vires stated that, following his arrest, he admitted to detectives that he lied and then told the detectives that he was "Eric Vires."

Following the suppression hearing, the district court denied Vires's motion to suppress the evidence obtained as a result of the traffic stop and search. First, the district court found that the initial traffic stop was reasonable based on Officer Covington's observation of a traffic violation. While the district court found "[s]ome facts of this case [to be] troubling," it credited Officer Covington's testimony, noting that he "testified clearly and unequivocally regarding the alleged traffic violation [that] he observed, and the [c]ourt finds that testimony credible." By contrast, the court found "Vires's credibility [was] in doubt . . . after he admitted lying to Officer Covington regarding his identity, asking Ms. Southerland to lie about his identity, and removing his shoes to hide from view a gun [that] he was transporting." Second, the court found that Officer Covington conducted a lawful inventory search of the vehicle pursuant to NLRPD policy. Because the court found the search justified on the basis of an inventory search, it declined to address Vires's argument that Southerland could not give consent to search the vehicle because she did not own the vehicle.

After the district court denied Vires's motion to suppress, he conditionally pleaded guilty to possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).

## II. *Discussion*

On appeal, Vires argues that he did not commit a traffic violation and that Officer Covington was going to initiate a stop of the vehicle regardless of any traffic violation; therefore, no probable cause justifies the traffic stop. Additionally, he argues that even if a valid traffic stop occurred, he did not give his consent to search the vehicle and Southerland did not own the vehicle and therefore could not give her consent to search it.

"The district court's order denying the motion to suppress is reviewed under two standards: factual findings are examined for clear error and legal conclusions de novo." *United States v. Wright*, 512 F.3d 466, 469 (8th Cir. 2008) (citation omitted).

## A. *Traffic Stop*

Vires argues that the traffic stop was pretextual because, according to him, no traffic violation occurred and Officer Covington made the stop solely on the basis of another narcotics officer advising him to do so.

A traffic stop constitutes a seizure under the Fourth Amendment; therefore, "it must be reasonable to pass constitutional muster." *Id*. at 471 (citation omitted). A police officer's "'decision to stop an automobile is reasonable where the police [officer] ha[s] probable cause to believe that a traffic violation has occurred.'" *Id*. (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). "'Any traffic violation, however minor, provides probable cause for a traffic stop.'" *Id*. (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc)). We have recognized that "[a]n otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'" *Id*. (quoting *United States v. Williams*, 429 F.3d

767, 771 (8th Cir. 2005)). In fact, a police officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. Thus, police officers possessing an objectively reasonable basis to believe that a driver is committing a traffic violation have "probable cause to conduct a traffic stop[,] and . . . the officers' subjective intentions in making the stop d[o] not affect the stop's validity for purposes of the Fourth Amendment." *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (citations omitted).

In *Wright*, the defendant argued that insufficient evidence supported the district court's finding that probable cause justified the traffic stop. 512 F.3d at 471. The defendant claimed to have "produced evidence to negate any evidence of a violation." *Id*. Specifically, he "argue[d] that his witness . . . undermined the credibility of the troopers, as did . . . the failure to tape the traffic violation or to record the subsequent conversations." *Id.* We rejected the defendant's argument, affirming the district court's finding of a traffic violation supported by probable cause. *Id.* at 472. We first recognized that "[t]here were two versions of the facts, and the district court chose to believe the troopers' testimony; the court's credibility determinations require a high degree of deference." *Id*. at 471. Thereafter, we explained that "[t]he lower court made credibility judgments based on the testimony and presentation of the witnesses, and it believed the troopers' testimony which supported the finding that [the defendant] did not stop at the stop sign. We g[a]ve great deference to [the] lower court's credibility determinations because the 'assessment of a witness's credibility is the province of the trial court.'" *Id*. at 472 (quoting *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995)). As a result, we found that sufficient evidence supported the district court's finding that the defendant committed a traffic violation, thereby giving the officers probable cause to initiate the traffic stop. *Id*.

This case is substantially similar to *Wright*. As in that case, the district court found Officer Covington's testimony about the traffic violation credible and found Vires's testimony not credible. Although the district court found it troubling that

Officer Covington was directed to make a traffic stop by another narcotics officer and that the patrol unit video camera did not function, the district court found that Officer Covington testified "clearly and unequivocally" regarding the traffic violation; by contrast, the court noted that Vires had lied repeatedly during the traffic stop, such as giving a false name, and also asked Southerland to lie for him. Giving great deference to the district court's credibility determinations, *see id.*, we conclude that sufficient evidence exists to support the district court's finding that Vires did commit a traffic violation. Officer Covington therefore had probable cause for the traffic stop, regardless of his subjective intent.

## B. *Search of Vehicle*

Vires also argues that even if a valid traffic stop occurred, Southerland lacked standing to consent to the search because the car's title was not in her name. In response, the government asserts that the search of the vehicle was *not* a result of consent from Southerland but instead an inventory search of the vehicle prior to towing pursuant to NLRPD policy.

The district court found that the search was valid as a reasonable inventory search, not a consent search. *See United States v. Smith*, 715 F.3d 1110, 1117 (8th Cir. 2013) ("Inventory searches are one exception to the general rule that searches conducted without a warrant are unreasonable." (citation omitted)).

On appeal, Vires offers no argument challenging the district court's finding that the search was a reasonable inventory search. He does not challenge the NLRPD's policy to tow a vehicle driven by someone with a suspended license, nor does he challenge Officer Covington's testimony on this issue. *See id.* ("The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." (quotation and citation omitted)). He also does not challenge the manner or

-10-

scope of the inventory search. *See id.* ("An inventory search must be reasonable under the totality of the circumstances . . . and may not be a ruse for general rummaging in order to discover incriminating evidence." (alteration in original) (quotation and citation omitted)). Because Vires does not challenge this holding on appeal, he thus has waived review of the inventory-search issue. *See Jeseritz v. Potter*, 282 F.3d 542, 548 (8th Cir. 2002) (citation omitted); *see also United States v. Alvarez-Manzo*, 570 F.3d 1070, 1076 (8th Cir. 2009) ("The district court determined that law enforcement lacked reasonable suspicion to justify the seizure of the bag. The government does not challenge the district court's conclusion in this appeal. By failing to do so, the government has waived review of the reasonable suspicion issue." (citing *Jeseritz*, 282 F.3d at 548)); *Freeman v. Ferguson*, 911 F.2d 52, 56 (8th Cir. 1990) ("It is well settled in this circuit if an issue is not raised on appeal it will be deemed abandoned." (quotation and citation omitted)). As a result, we affirm the district court's finding that the inventory search was reasonable and lawful.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____