**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Mark Bradley KLINGINSMITH,**
**Defendant–Appellant.**

No. 93–3218.

United States Court of Appeals,
Tenth Circuit.

June 17, 1994.

David Lind (Randall K. Rathbun, U.S. Atty., and Thomas G. Luedke, Asst. U.S.

Atty., with him on the brief), Topeka, KS, for plaintiff-appellee.

Steven L. Davis of Patton, Davis & Putnam, Emporia, KS, for defendant-appellant.

Before BALDOCK, Circuit Judge, and McWILLIAMS, Senior Circuit Judge, and SHADUR, Senior District Judge.*

McWILLIAMS, Senior Circuit Judge.

Mark Bradley Klinginsmith and Fredrick Aldon Magee were jointly charged in the first count of a two-count indictment with unlawfully conspiring on November 12, 1992, to possess with an intent to distribute approximately 182 pounds of marijuana, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). In the second count, both were charged with unlawfully possessing on November 12, 1992, with an intent to distribute approximately 182 pounds of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2.

Prior to trial, Magee, pursuant to a plea agreement, pled guilty to one count and agreed to testify against Klinginsmith and later did so.

A jury convicted Klinginsmith on both counts, and he was sentenced to imprisonment for 78 months. On appeal, Klinginsmith raises three matters: (1) the district court erred in denying his pretrial motion to suppress the use at trial of the 182 pounds of marijuana found by the police in the vehicle which Magee was driving and in which Klinginsmith was a passenger; (2) the district court erred in denying his motion for a mistrial based on an alleged violation of the district court's sequestration order; and (3) the district court erred in determining that the amount of marijuana taken from his automobile was at least 80 kilograms, resulting in a base offense level of 24, whereas if the amount was less than 80 kilograms his base offense level would have been 22. We find no reversible error and affirm.

---

* Honorable Milton I. Shadur, Senior District Judge for the Northern District of Illinois, sitting by designation.

## I. *Motion to Suppress*

 Klinginsmith's first ground for reversal is the district court's failure to grant his motion to suppress the use at trial of the 182 pounds of marijuana seized in a search of his vehicle. In this regard, Klinginsmith claims that his Fourth Amendment rights were violated. The district court held an evidentiary hearing on this motion and denied the same, except as to some rather minor matters. More about that later. Some background facts as developed at the hearing on the motion to suppress will place this issue in focus.

The Kansas Highway Patrol ("KHP") developed a rather novel, to us at least, investigative technique for detecting drug couriers using Kansas highways. Interstate I–35, a four-lane highway, runs in a northeasterly direction from Wichita, Kansas, going through Emporia, Kansas and on to Kansas City, Kansas. We are here concerned with a light blue 1992 Buick LeSabre, bearing Nebraska license plates, which was proceeding from Wichita to Kansas City on November 12, 1992. The vehicle was driven by Magee, and Klinginsmith was a passenger therein.

Exit 160 from I–35 leads to Melvern, Kansas, a small hamlet located in Osage County, Kansas. Just south of Exit 160, the KHP placed a large sign, visible to all driving northeasterly on I–35, which read as follows: "NARCOTIC CHECK LANE AHEAD." This sign was but a ruse, as there was no NARCOTIC CHECK LANE AHEAD. Exit 160 indicates that Melvern is to the north, and that a frontage road is to the south. The reason for the sign reading NARCOTIC CHECK LANE AHEAD was the belief of the KHP that if after reading the sign a driver, particularly an out-of-state driver, turned off at Exit 160, such would possibly indicate that the driver did not want to go through a narcotics check, and would therefore suggest that he or she might be carrying drugs.

In any event, traffic turning off I–35 at Exit 160 was monitored by the KHP. At approximately 10:50 a.m. on November 12,

1992, Troopers Simone and Heady, who were driving separate cars, were advised that a blue vehicle bearing Nebraska license plates had left I–35 at the Melvern Exit and was proceeding south on a gravel frontage road at a high rate of speed. Both troopers began pursuing the car, Trooper Simone driving 80 miles per hour in order to catch up and make visual contact with the vehicle. After traveling some three and one-half miles, Trooper Simone spotted the vehicle. The car, a light blue Buick LeSabre, was just coming to a stop at a stop sign where the gravel frontage road meets "old" Highway 50. Trooper Simone observed the car turn left, travel a short distance and then pull into a gas station where the driver stopped near the diesel pumps.

At this point, Trooper Simone drove his car into the gas station and stopped several feet behind the Buick. The driver of the Buick, Magee, left his vehicle and began walking toward Trooper Simone's car. The passenger, Klinginsmith, remained in the Buick. Trooper Simone left his car and asked Magee if he could ask some questions. Magee agreed. Magee said he had exited I–35 to look for a gas station, and that he was traveling from Oklahoma City, Oklahoma to Lincoln, Nebraska. Upon request, Magee produced a driver's license. Magee indicated that the vehicle had been rented by Klinginsmith. The conversation between Trooper Simone and Magee lasted some 30 seconds.

By this time, Trooper Heady had arrived at the scene and parked behind Trooper Simone's car. His car had a video camera mounted on the dashboard and a wireless microphone, which he used when operating the video camera. Trooper Heady activated the video camera and the microphone, and the events that thereafter occurred at the gas station within view of the camera were tape recorded. The district judge viewed, and heard, the tape at the suppression hearing.

Trooper Simone then proceeded to the passenger's side of the Buick and asked Klinginsmith if he would mind answering a few questions. Klinginsmith consented and said they were coming from Mississippi and that he didn't know just where they were going.

He produced a driver's license and the rental papers for the car. Magee, in the meantime, told Trooper Heady that though they were coming from Oklahoma City, the trip had originated in Mississippi where they had been building parking lots.

Jumping ahead, Trooper Heady asked Klinginsmith if there were any weapons or drugs in the car, and Klinginsmith said there were not. And in response to an inquiry as to whether the car could be searched, Klinginsmith said he had no objection. Magee, in response to inquiry said he, too, had no objection to a search of the Buick.

By this time, a dog had been brought to the scene and it "alerted" to the Buick automobile. At this point, the officers handcuffed Magee and Klinginsmith. The "alerting" and handcuffing occurred about 15 minutes after Trooper Simone had pulled in behind the Buick at the gas station. The key for the trunk was not immediately forthcoming, but eventually Klinginsmith showed the troopers where the key to the trunk had been hidden. The trunk was then opened and a number of packages of marijuana were discovered under a green tarp. We will consider the amount of marijuana found in the Buick in part III of this opinion. About 38 minutes after the dialogue started between Trooper Simone and Magee, the defendants were arrested and both given a *Miranda* warning.

Based on the record before him, the district judge denied the motion to suppress, though he did order that the government could not use any statements made by the defendants after they were handcuffed and before they were given the *Miranda* warning.

In denying, in the main, the motion, the district court reasoned that Troopers Heady and Simone did not violate any of Klinginsmith's Fourth Amendment rights when they followed the Buick vehicle as it exited I–35 and proceeded south on the frontage road. The district court held that the troopers did not themselves "stop" the other vehicle which was stopped alongside a pump by Magee. The district court concluded that the preliminary questioning concerning driver's license, car registration, where they were coming

from, and where they were going, was a consensual encounter, and that even if it was an investigative detention, it was supported by reasonable, articulable suspicion under the *Terry*-stop doctrine. Further, the district court concluded that within about 15 minutes after the initial dialogue, both Klinginsmith and Magee consented to the car being searched. And when the canine "alerted" to the vehicle, the district court held that the officers had probable cause to arrest the defendants and effect an immediate search under the automobile exception to the search warrant requirement.

We agree completely with the district court's analysis of this matter. The fact that Troopers Simone and Heady "followed" Magee and Klinginsmith down the frontage road does not constitute a "seizure." *See United States v. Langston,* 970 F.2d 692, 697–98 n. 3 (10th Cir.1992) (consensual encounter when driver pulled over after an officer drove up alongside him and made eye contact), *cert. denied,* —— U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992), 113 S.Ct. 479 (1992), —— U.S. ——, 113 S.Ct. 495, 121 L.Ed.2d 433 (1992), —— U.S. ——, 113 S.Ct. 1872, 123 L.Ed.2d 491 (1993). The troopers did not stop the Buick. Magee did. The questioning of each regarding license, car registration, and the like is permitted by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny, where there is, as in the instant case, reasonable suspicion of criminal activity.[1] Both Magee and Klinginsmith consented to a search of the car, which would have justified the police in searching the Buick without the intervening fact that a dog "alerted" to the vehicle. And when the dog "alerted," there was probable cause to arrest Magee and Klinginsmith and to search the vehicle without a warrant under the automobile exception even had there been no prior consent. *United States v. Stone,* 866 F.2d 359, 364 (10th Cir.1989). We think the

district court correctly analyzed the course of events, on a step-by-step basis.

## II. *Sequestration*

 Prior to trial, apparently upon request, the district court entered a so-called sequestration order concerning witnesses. As far as we can tell, the sequestration order is not in the record before us. In any event, on the second day of the trial, in the morning, Magee was called as a government witness. Whether it developed on cross-examination of Magee, we cannot tell, but defense counsel advised the court that he believed that possibly there had been a violation of the sequestration order in that Magee had discussed his testimony with the Assistant United States Attorney and Troopers Simone and Heady earlier that same morning. The district court thereafter held an immediate hearing on the matter, outside the presence of the jury, at which time Troopers Simone and Heady, and also Magee, were examined and cross-examined by counsel. At the conclusion of the hearing, the district court found that any violation of the sequestration order did not result in prejudice to Klinginsmith. We agree.

The district judge apparently did not have the sequestration order before him, and it is not in the record before us. Its terms, then, are uncertain, at least so far as we are concerned. At the hearing, it developed that the Assistant United States Attorney had brief conversation with Troopers Simone and Heady on the previous evening, at which time he asked Heady to be present when he talked with Magee the next morning before trial reconvened. Both troopers had already testified. Apparently Magee was brought to the courthouse that night and placed in a holding cell adjacent to the Marshal's office. A short meeting was held at 8:00 a.m. on the

---

1. The district court identified several factors which, considering the totality of the circumstances, justified the investigative detention of Magee and Klinginsmith: (1) I–35 is a known avenue for drug transportation; (2) the defendants took an exit which was the first exit after a narcotics check lane sign, and an exit that was seldom used; (3) the defendants traveled down an unmarked gravel road; (4) the driver of the

car indicated that they were looking for a gas station, when they had just passed several gas stations on the highway; (5) the defendants appeared very nervous; and (6) they gave conflicting stories about the details of their trip. *See United States v. Sokolow, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)* (in determining the validity of an investigative stop, the court must consider the totality of the circumstances).

second day of trial. And what occurred at this meeting was fully developed by counsel.

At the outset, the Assistant United States Attorney, of course, has a right to interview his witnesses before they testify, and any sequestration order could not prohibit such. Trooper Heady was the "case agent" on the case, and he, too, by virtue of that fact, was apparently immune from any sequestration order. Trooper Simone was simply present at this meeting, and the conversation was primarily between the Assistant United States Attorney and Magee.

The district judge heard from all parties involved and denied the motion for a mistrial. He examined the matter carefully, and his reasoning was fully set forth and is attached to this opinion as an attachment. Even assuming a violation of a sequestration order, which we cannot ascertain, the court still would have to decide whether the rather drastic remedy of a mistrial is required. *See United States v. Buchanan,* 787 F.2d 477, 485 (10th Cir.1986) (even if a sequestration order is violated, the defendant must still show that probable prejudice resulted from the violation); *see also United States v. Greschner,* 802 F.2d 373, 376 (10th Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). The district court determined that a mistrial was not necessary, and we agree.

### III. *80 Kilograms*

■ The Sentencing Guidelines provide that if the amount of marijuana is at least 80 kilograms, but less than 100 kilograms, the base offense level is 24, whereas if the amount is less than 80, but at least 60 kilograms, the base offense level is 22. USSG § 2D1.1(c)(10) and (11). Counsel contended that the amount involved was less than 80 kilograms and objected to that part of the presentence report which found that at least 80 kilograms of marijuana was taken from the Buick LeSabre. A hearing was held, and the district court found that the amount involved was at least 80 kilograms and accordingly found a base offense level of 24. On appeal, counsel argues that the district court's finding is not supported by the record.

Found in the trunk of the Buick car were 10 "bricks" of marijuana wrapped in Saran Wrap, and 2 paper sacks containing lesser amounts of marijuana were found inside luggage in the Buick's passenger compartment. The KHP weighed the marijuana thus seized on November 12, 1992, and ascertained that it weighed 82.55 kilograms, including packaging. The marijuana was turned over to the Kansas Bureau of Investigation and James Baer, a chemist with that agency, testified that on December 12, 1992, he weighed the marijuana and found it to have a net weight of 80.3 kilograms. On order of court, Baer again weighed the marijuana on July 8, 1993, and found it to then have a net weight of 76.72 kilograms. He explained that with the passage of time there was a loss of moisture, and he offered an expert opinion that on November 12, 1992, the marijuana weighed more than 80 kilograms. The district court found that the total amount of marijuana was at least 80 kilograms, and we cannot say that such is unsupported by the evidence. The test is what did the marijuana weigh on November 12, 1992, including the moisture content thereof. *United States v. Pinedo–Montoya,* 966 F.2d 591, 595–96 (10th Cir. 1992); *United States v. Molina–Cuartas,* 952 F.2d 345, 348–49 (10th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1698, 118 L.Ed.2d 408 (1992).

Judgment affirmed.

### ATTACHMENT

THE COURT: Do not bring the jury in yet. I was trying to convey to you that I'm prepared to go ahead with the case. Let me say to you that after hearing the testimony of the three witnesses in this case, I do not find any evidence that this gentleman's testimony was in any way influenced by the testimony of the other two witnesses. All of the witnesses have testified that they did not tell this witness—the other two witnesses have testified that they did not tell this witness anything that they said in their testimony, and anything that this gentleman knows of his own recollection is his testimony and not the testimony of someone else. And I think this gentleman has said clearly that the other

two witnesses did not disclose to him in any way the testimony that they gave to the Court.

Now, the Court has pointed out that I should have given further advice in regard to the use of—and the testimony of witnesses. After they have testified, I should have made sure that they stayed out and that they understood fully that they were not to discuss their testimony with other witnesses. I do not find any evidence that they did discuss their testimony with any witnesses.

And overall, anything that's been disclosed to the Court today I do not find to be prejudicial in any way to the defendant's case or prejudicial to anything this gentleman has said. I found no evidence that this gentleman's testimony was influenced in any way by the meeting that took place this morning. In fact, all of the evidence that came out this morning has been pretty well heard by this Court before by the other witnesses, and I might point out to you, also, that this gentleman did not in any time in his original testimony testify about the luggage situation. We've tried to keep careful notes, and we have found no testimony about the luggage.

In addition to that, I have allowed the defense to fully explore the scope of the conversation this morning in its cross-examination of all three of these witnesses. I'm prepared to let the defense continue to ask questions about this matter in the presence of the jury which would show that a meeting took place, and then I'll let the defense go ahead and find out if this gentleman was in any way influenced in his testimony by any of the conversations that took place this morning.

So that's going to be the ruling of the Court. I do not find any prejudice now that we have explored the matter. And I do think that all three of the witnesses, including this gentleman, have reaffirmed their previous beliefs in this case, at least the previous testimony, that they have said—and all three of the witnesses have told me that they did not discuss their testimony back and forth. So I think that's the situation, and although there was a problem, I think the problem has now disappeared, and I'm ready to proceed. We can bring in the jury and go ahead.