FILED
United States Court of Appeals
Tenth Circuit

June 5, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DENNIS DEAN NEFF,

Defendant-Appellant.

No. 10-3336

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## (D.C. No. 5:09-CR-40071-JAR-1)

Christopher Joseph, Joseph & Hollander, LLC, Topeka, Kansas, for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

Before **BRISCOE,** Chief Judge, **BALDOCK** and **LUCERO**, Circuit Judges.

**BRISCOE**, Chief Judge.

Defendant-Appellant Dennis Dean Neff entered a conditional guilty plea on one count of traveling in interstate commerce with the intent to distribute cocaine, in violation of 18 U.S.C. § 1952(a)(1). He was sentenced to sixty months' incarceration. Under the

terms of the plea agreement, Neff reserved his right to appeal the district court's denial of his motion to suppress evidence.

On appeal, Neff argues that the state trooper's initial stop of his vehicle was unconstitutional because the trooper lacked reasonable, articulable suspicion of criminal activity under Terry v. Ohio, 392 U.S. 1 (1968). We conclude that the facts known to the trooper at the time of the initial stop did not rise to the level of reasonable, articulable suspicion by providing a particularized and objective basis for wrongdoing. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's denial of the motion to suppress and remand with directions to vacate Neff's conviction.

I

Around noon on July 31, 2009, Neff was driving eastbound on a rural stretch of Interstate 70 through Wabaunsee County, Kansas. He passed three signs, posted by Kansas Highway Patrol (KHP) troopers along the highway, that read "Drug Check Ahead" and "Drug Dogs in Use" in English and Spanish. In reality, there was no checkpoint on the interstate. Instead, troopers had positioned themselves near the Spring Creek Road exit ramp, just beyond the signs, to watch for vehicles attempting to evade the purported drug check. The Spring Creek Road exit leads to "a rural, gravel road speckled with residences" but no businesses. ROA, Vol. 1 at 46.

KHP Lieutenant Kirk Simone was stationed on the far side of the eastbound exit ramp, where he used binoculars to monitor vehicles that used the exit. A second officer, Trooper Brian Smith, waited on the south side of the highway near the exit to observe

2

vehicles "as they went off the exit ramp when Lieutenant Simone called them out." Id., Vol. 2 at 14. When Lieutenant Simone saw Neff's red Chevrolet Monte Carlo take the exit ramp, he radioed Trooper Smith to watch for the vehicle.

Trooper Smith, driving a marked patrol car, followed Neff after he took a left turn on to Spring Creek Road and began driving north. As he tailed Neff, he radioed the dispatcher to check the car's license plate number. The dispatcher responded that the tag was registered to an address in nearby Topeka, Kansas. Continuing his pursuit, the trooper followed Neff past one residential driveway before stopping to watch the car turn into a second driveway. Neff briefly stopped his car in the driveway and turned his head toward the road. Before he started to back out of the driveway, Neff looked at the trooper and gave him a "startled look." Id. at 20. He then backed out of the driveway, turning the car back in the direction of the interstate. By this time, Trooper Smith had positioned his patrol car in the middle of the road and had gotten out of the vehicle. Now standing in the middle of the road, the trooper put out his hand to signal for Neff to stop. He had not observed Neff commit any traffic violations. Neff stopped and rolled down his window.

Trooper Smith proceeded to investigate Neff and the vehicle's two passengers.[1] Neff told the trooper that they were driving from Junction City, Kansas, where they had gone to look at a car. The trooper asked Neff to get out of the car, and he conducted a

---

[1] Ralfeal Eron Carr, who was sitting in the front passenger seat, was indicted with Neff on August 12, 2009, and he filed a separate motion to suppress that is not part of this appeal. See Mem. & Order Denying Defs.' Mots. to Suppress at 6-7, United States v. Carr, No. 5:09-CR-40071-JAR-2 (D. Kan. Jan. 5, 2010) (Doc. 41). A second passenger, referred to only as "Meleka," was in the back seat. Id. at 4.

brief patdown.[2]  Finding no weapons or contraband, the trooper continued to ask Neff

questions.  He explained that he thought it was odd for a car with Shawnee County tags to

use the Spring Creek Road exit, implying that Neff had used the exit to avoid a drug

checkpoint.  Neff then volunteered, "I have a crack pipe on me."  After first calling for

backup, the trooper searched the passenger compartment of the car and found nothing.

He then used the car's key fob to activate the trunk release.  In the trunk, he found

zippered duffel bags that contained seven kilogram-sized brick-shaped objects, later

determined to contain cocaine, and $10,000 in U.S. currency.  The trooper placed the

three occupants of the car under arrest.

A grand jury indicted Neff on two counts: (1) conspiracy to distribute and possess

with the intent to distribute approximately seven kilograms of cocaine, in violation of 21

U.S.C. § 846; and (2) knowingly and intentionally possessing with intent to distribute

cocaine, in violation of 21 U.S.C. § 841(a)(1).  Neff moved to suppress the admission of

the evidence seized from the car.  He argued that the initial stop violated his Fourth

Amendment rights because (1) he had not committed a traffic violation, and (2) the

trooper lacked reasonable suspicion to believe he was engaged in criminal activity.  He

argued that there was no "legal reason, beyond sheer speculation" for the stop.  Id., Vol. 1

at 20.  At the suppression hearing, Trooper Smith provided this testimony regarding the

stop:

---

[2]  Because of our ultimate disposition in this case, we do not reach the issue of whether the trooper had reasonable suspicion to conduct this brief patdown search.

> The reason I stopped him is they got off the interstate after seeing the drug check lane ahead signs, it was a Shawnee County car went into a rural Wabaunsee County area, pulling into a driveway where I don't think the vehicle belonged, the surprised look that the driver gave me, the short time that they stayed there, the surprised look that he gave me. I thought something is very suspicious about this that I didn't really care for or didn't like. Therefore, I stepped out of the vehicle when he pulled out. That's when I stopped them.

Id., Vol. 2 at 69. Following up on that testimony, the government argued that the trooper had reasonable suspicion based on two separate grounds. First, Neff was "patently evasive" when he avoided "a clearly marked drug checkpoint on I-70 by exiting the highway, and then proceeded onto a rural dirt road and randomly pulled into a private drive." Id., Vol. 1 at 30. A "second and independent basis for stopping the vehicle" was "that the vehicle had a registration plate from Shawnee County, it was driving in a fairly secluded and rural area in Wabaunsee County, and it pulled into a private drive where it apparently had no legitimate business." Id. at 35-36.[3] The government conceded that some of these actions were consistent with innocent travel, but counsel argued that the totality of the circumstances rose to the level of reasonable suspicion.

The district court denied Neff's motion to suppress. In considering the initial stop, the court found that the totality of the circumstances were sufficient to give the trooper reasonable suspicion to justify a short investigative detention. The court gave particular

---

[3] The government also argued that the trooper "could have reasonably concluded that [the car's] occupants were scouting properties in the area for possible burglaries." Id. At 35. We note, however, that the trooper made no mention of this rationale when providing his reasons for the stop.

5

credence to the rural location of the Spring Creek Road exit, concluding that "[t]his particular Exit . . . had very little utility for Interstate travelers unless they were seeking to access the houses located on those particular gravel roads." Id. at 55. In addition, Neff exhibited "uncertain driving patterns immediately after passing signs indicating a drug check." Id. at 57. This included the fact that Neff "did not immediately loop back on to the Interstate at the first available opportunity, nor did he use the first available private driveway to turn around." Id. at 56-57. Moreover, Neff's "license plate indicated he did not live in Wabaunsee County" and he "seemed unsettled and immediately pulled out of the private drive." Id. at 57.

As part of a plea agreement, Neff waived his right to be charged by indictment, and the government filed an information charging Neff with one count of traveling in interstate commerce with intent to distribute cocaine, in violation of 18 U.S.C. § 1952(a)(1). Neff pleaded guilty to the charge in the information, and the charges in the indictment were dismissed on the government's motion. He preserved his right to appeal the district court's denial of his motion to suppress in a plea agreement.

II

Neff's sole argument on appeal is that the district court erred in denying his motion to suppress the evidence recovered from the trunk of the car. He contends that Trooper Smith's decision to stop the car was based on a hunch that criminal activity was afoot, not reasonable, articulable suspicion. He also argues that the district court gave undue weight to factors that are "entirely consistent with innocent travel" and "susceptible to varying

6

interpretations." Aplt. Br. at 13.

"On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error, its conclusions of law de novo, and view the evidence in the light most favorable to the prevailing party." United States v. Gallegos, 314 F.3d 456, 458 (10th Cir. 2002) (citing United States v. Maden, 64 F.3d 1505, 1508 (10th Cir. 1995)).

## A

This case presents the familiar question of what level of proof is required to establish reasonable, articulable suspicion of criminal activity. As a general matter, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30). In reviewing an investigatory stop for reasonable suspicion, we must consider "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). While certain facts, taken in isolation, may be "quite consistent with innocent travel," these facts may, in the aggregate, add up to reasonable suspicion. Sokolow, 490 U.S. at 9. "Indeed, Terry itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.'" Id. at 9-10 (quoting Terry, 392 U.S. at 22).

While the legal framework for a <u>Terry</u> stop is familiar, we have never squarely

confronted the "ruse drug checkpoint" operation utilized by KHP in this case. At least

some of the conduct relied upon in the trooper's reasonable suspicion analysis was

prompted by a law enforcement tactic that was designed to elicit, or at least expose,

suspicious behavior. While we have approved the use of ruse drug checkpoint signs in

dicta,[4] other courts have had a greater opportunity to refine their jurisprudence in this

area.

At the outset, we note that the Supreme Court has held "actual" roadside drug

checkpoints are unconstitutional. In <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 48

---

[4] <u>See</u> <u>United States v. Flynn</u>, 309 F.3d 736, 738 (10th Cir. 2002). In <u>Flynn</u>, the defendant "made an abrupt lane change and immediately took the exit ramp" just after passing a sign reading "Drug Checkpoint 1/3 mile ahead." <u>Id.</u> at 737. When the car reached the top of the ramp, the defendant "stopped his car briefly while his passenger . . . opened the door and dropped a large sack from the car." <u>Id.</u> Officers hiding in underbrush near the exit ramp emerged to examine the sack, which contained methamphetamine. <u>Id.</u> They advised the officers on the highway of the contents, and officers stopped and arrested the driver. <u>Id.</u> On appeal from the denial of a motion to suppress, the defendant cited <u>Edmond</u> for the proposition that his abandonment of the drugs was involuntary in response to an illegal narcotics checkpoint. <u>Id.</u> at 738. We rejected this argument because "Flynn never reached a drug checkpoint," and "he acted voluntarily in response to a ruse established by the police." <u>Id.</u> That ruse, we said, did "not constitute illegal police activity." <u>Id.</u> (citing <u>United States v. Klinginsmith</u>, 25 F.3d 1507, 1508 (10th Cir. 1994)). The officers "developed a reasonable individualized suspicion of wrongdoing" sufficient to stop the car when the officers discovered that the discarded sack contained drugs. <u>Id.</u> at 739 (citing <u>Edmond</u>, 531 U.S. at 37).

<u>Flynn</u> is not squarely on point because the officers in that case had more evidence than just observing a vehicle take an exit before a posted drug checkpoint. The officers in <u>Flynn</u> observed a passenger drop a sack out of the car's window, and they were quickly able to ascertain that the sack contained narcotics. These facts alone provided probable cause to stop the vehicle. Thus it was unnecessary to justify the stop on the basis of the driver's decision to use a highway exit after passing checkpoint signs.

(2000), the Court held that a narcotics checkpoint whose primary purpose "is ultimately indistinguishable from the general interest in crime control" violates the Fourth Amendment. In that case, Indianapolis police had established vehicle checkpoints in an effort to interdict illegal drugs. Id. at 34. The roadblocks were staffed by approximately thirty officers who would "stop a predetermined number of vehicles." Id. at 35. The checkpoints were generally operated during the day and were identified with signs reading, "NARCOTICS CHECKPOINT ___ MILE AHEAD, NARCOTICS K-9 IN USE, BE PREPARED TO STOP." Id. at 35-36 (internal quotation marks omitted). The officers would stop groups of cars, investigating each one while other traffic proceeded without interruption. Id. at 36. The Court concluded that the "primary purpose" of the Indianapolis checkpoint operation "was to detect evidence of ordinary criminal wrongdoing." Id. at 41. The Court distinguished such a program from those that are "designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety," both of which the Court had previously held to be constitutional. Id. at 42-43; see also Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 451 (1990) (sobriety checkpoints constitutional); United States v. Martinez-Fuerte, 428 U.S. 543, 561-64 (1976) (border checkpoints constitutional). Despite the City of Indianapolis's arguments that "the severe and intractable nature of the drug problem" justified the checkpoint program, the Court "decline[d] to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." Edmond, 531

9

U.S. at 44 (emphasis added).

In the wake of <u>Edmond</u>'s rebuke of suspicionless drug checkpoints, some law enforcement organizations began the practice of setting up ruse drug checkpoints. In what may be understood as the first generation of post-<u>Edmond</u> drug checkpoints, police would set up "drug checkpoint ahead" signs on the highway but then operate a full-scale checkpoint at the next (likely rural) off-ramp. The theory behind this alteration was that the police would have an element of individualized suspicion for every vehicle that took that ramp because there were few "legitimate" reasons for using an exit in an isolated area.

While this modification significantly minimizes the number of innocent drivers subjected to police intrusion, these ramp drug checkpoints remain problematic because their "primary purpose is ultimately indistinguishable from the general interest in crime control." <u>See</u> <u>Edmond</u>, 531 U.S. at 44, 48 ("Because the primary purpose of the Indianapolis checkpoint program is ultimately indistinguishable from the general interest in crime control, the checkpoints violate the Fourth Amendment."). In <u>United States v. Yousif</u>, the Eighth Circuit held unconstitutional a scheme involving "signs . . . placed along the highway warning travelers that they were approaching a drug checkpoint further down the highway, yet the checkpoint was actually located on the ramp which exited the highway a short distance past the signs." 308 F.3d 820, 823 (8th Cir. 2002). The officers were instructed to stop every vehicle that took the exit after the ruse checkpoint signs. <u>Id.</u> The court was unable to distinguish this ramp drug checkpoint program from the roadside

drug checkpoint program held unconstitutional in Edmond because "its primary purpose was the interdiction of drug trafficking" in the absence of any basis for individualized suspicion. Id. at 827. The court recognized that while the modified program differed from the practice in Edmond, the same constitutional problems persisted. While some drivers may have taken the exit to avoid police conduct, that did not "create individualized reasonable suspicion of illegal activity as to every one of them." Id. "Indeed, as the government's evidence indicated, while some drivers may have wanted to avoid being caught for drug trafficking, many more took the exit for wholly innocent reasons—such as wanting to avoid the inconvenience and delay of being stopped or because it was part of their intended route." Id. at 827-28; see also United States v. Huguenin, 154 F.3d 555, 556 (6th Cir. 1998) (holding unconstitutional, in a pre-Edmond case, a roadside checkpoint that "was not operated for the ostensible purpose of detecting intoxicated drivers, but as a pretext to stop drivers who had violated no traffic laws in order to question them in an attempt to gain reasonable suspicion to search their cars for narcotics").

In the wake of Edmond and Yousif, some law enforcement agencies began taking the approach employed by the KHP in this case. For example, in a more recent case, the police set up ruse drug checkpoint signs at the same point on the Missouri interstate as they did in Yousif, right before the Sugar Tree Road exit. See United States v. Carpenter, 462 F.3d 981, 983 (8th Cir. 2006). But instead of operating a full-blown checkpoint at the top of the exit ramp, the officers "'watch[ed] for any nonlocal traffic that would exit

11

the interstate'" and tried "'to get reason to stop them.'" Id. When Christopher Carpenter used the exit and turned onto the rural county road, an officer followed him. Id. Carpenter soon "realized there were no services at the exit, and when he looked in his rear view mirror, he saw that a police car was following him. Concerned that he had 'driven into a trap,' he decided to make a U-turn and pulled onto the side of the road." Id. The officer parked behind Carpenter's vehicle, activated his vehicle's emergency lights, and approached on foot. Id. The Eighth Circuit concluded that the stop was constitutional, finding Yousif "readily distinguishable." Id. at 986. Unlike Yousif, this police operation "d[id] not involve an illegal checkpoint at which all vehicles exiting the highway were stopped." Id. The court reasoned that "Carpenter's act of exiting just after the checkpoint signs may be considered as one factor in the totality of circumstances, although it is not a sufficient basis standing alone to justify a seizure." Id. at 987. In forming reasonable suspicion, the officer also could have relied on Carpenter's out-of-state license plates and the fact that he pulled over and parked on the side of the road for no apparent reason. Id. The court explained that while "[s]ome innocent travelers with a quarter tank of gas may leave a highway after drug checkpoint signs looking for fuel at an exit with no signs for services," those circumstances "are sufficiently unusual and suspicious that they eliminate a substantial portion of innocent travelers, and provide reasonable suspicion to justify the brief detention" of a vehicle. Id.

More recently, in United States v. Prokupek, 632 F.3d 460 (8th Cir. 2011), officers set up ruse checkpoint signs on an interstate and waited for vehicles to take the next exit.

12

An officer observed a vehicle take the exit and turn onto the rural road at the end of the off-ramp. Id. at 461. The officer explained that he stopped the driver because he failed to indicate his turn off the highway, even though he had signaled his turn onto the rural road. Id. The officer called in a drug dog, which alerted to the vehicle. Id. A search revealed methamphetamine. Id. The officer gave conflicting testimony at the suppression hearing that "clearly and affirmatively contradicted" his earlier statement to the driver that he made the stop because he failed to indicate his intention to take the exit. Id. at 463. Also, on appeal, the government conceded that the officer had not been in a position to observe the vehicle's exit from the interstate. Id. The government had not proffered an alternative justification for the stop. Id. In light of these developments, the Eighth Circuit held that the stop was unconstitutional. Id. The court noted that it had previously held that "reasonable suspicion for a traffic stop cannot be based solely on the fact that a driver exits an interstate after seeing a sign indicating that a drug checkpoint lies ahead . . . [but] a traffic stop pursuant to a ruse checkpoint does not violate the Fourth Amendment if the driver commits a traffic violation when exiting the interstate." Id. (citing Carpenter, 462 F.3d at 986-87; Wright, 512 F.3d at 471). The court concluded that, without an observed traffic violation or some other indicia of wrongdoing, the stop was unconstitutional.

## B

We agree with the Eighth Circuit that a driver's decision to use a rural highway exit after seeing drug checkpoint signs may serve as a valid, and indeed persuasive, factor

13

in an officer's reasonable suspicion analysis. See, e.g., Carpenter, 462 F.3d at 987;

United States v. Klinginsmith, 25 F.3d 1507, 1510 n.1 (10th Cir. 1994) (listing as one

valid factor that "the defendants took an exit which was the first exit after a narcotics

check lane sign, and an exit that was seldom used"). But standing alone, it is insufficient

to justify even a brief investigatory detention of a vehicle. Here, of course, the

government points to a number of other factors that the trooper relied on in forming

reasonable suspicion, including: (1) Neff's car had a Shawnee County license plate but

was driving in Wabaunsee County; (2) the exit was in a rural area without highway

services such as restaurants or gas stations; (3) Neff pulled into a private driveway where

he did not seem to have any reason to be; (4) Neff had a startled look on his face when he

saw the trooper.

1

We are mindful that a series of otherwise innocent actions may be sufficient, when

taken together, to support a finding of reasonable suspicion. See Arvizu, 534 U.S. at 277.

For example, a driver's sudden reaction or evasive behavior in response to ruse

checkpoint signs may contribute to reasonable suspicion. See, e.g., United States v.

Smith, 396 F.3d 579, 581 (4th Cir. 2005) (vehicle approaching driver's license checkpoint

"appeared to slam on its brakes" and turned onto a private gravel driveway about 810 feet

from the checkpoint). Along these lines, the government argues that Neff's behavior in

response to the ruse checkpoint signs was "patently evasive and nervous." Aplee. Br. at

11. Specifically, the government points to Neff's decision to turn onto a rural road in a

14

sparsely populated area, his decision to "randomly enter[] a private driveway of a residence," and his "startled and surprised look" upon seeing Trooper Smith. Id. The government argues that Neff's "evasion of the drug checkpoint qualifies as a species of unprovoked flight—or avoidance—warranting the inference that criminal activity is afoot." Id. at 12.

An individual's "unprovoked flight upon noticing the police" and "nervous, evasive behavior" are relevant factors in determining reasonable suspicion for a brief investigatory stop. Illinois v. Wardlow, 528 U.S. 119, 124 (2000). But the facts of Wardlow must be taken in context. That case involved a pedestrian's "headlong flight" from an area of heavy narcotics trafficking after seeing a caravan of officers. Id. Casting Neff's conduct in the same light imputes a motive to evade police based on factors that are, unlike in Wardlow, not probative of criminal activity. First, while Neff's decision to take the Spring Creek Road exit could be interpreted as evasive, it is difficult to equate the decision to use an exit ramp off a busy highway with the Wardlow defendant's decision to flee on foot upon observing a caravan of officers in a high-crime area. See id. at 121-22. Likewise, Neff's driving pattern does not approach the level of suspicion of a driver who "appeared to slam on [the] brakes" just before reaching an actual checkpoint. See Smith, 396 F.3d at 581. The connection between the checkpoint signs and Neff's decision to use the nearby Spring Creek Road exit was tenuous. There was no testimony that Neff suddenly swerved to make the exit, changed lanes abruptly, or otherwise drove erratically in response to the signs.

15

Second, Neff's decision to turn around in a driveway is plausibly evasive. The government suggests turning around in the driveway was part of Neff's pattern of evasive conduct, but without some evidence Neff was even aware of the trooper's presence, his turning around in the driveway provides minimal support to justify the stop. In contrast, the defendant in Carpenter realized he was being followed, made a U-turn, and pulled to the side of the road and stopped. Similarly, Neff's "startled look" adds little of value to the equation. Exhibiting surprise at the sudden appearance of an officer on a rural road is hardly comparable to the "nervous, evasive behavior" the Court discussed in Wardlow. See 528 U.S. at 124-25.

These facts, when taken together, do not fairly suggest that Neff was attempting to evade police. To be sure, an officer is "entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants." Arvizu, 534 U.S. at 276. But even considering the totality of the circumstances, Neff's conduct conformed to the patterns of everyday travel. While "Terry accepts the risk that officers may stop innocent people," Wardlow, 528 U.S. at 126, "[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." United States v. Brugal, 209 F.3d 353, 359 (4th Cir. 2000) (en banc). Here, the factors articulated by the trooper "are not probative of behavior in which few innocent people would engage." Id.

2

We join the Eighth Circuit in holding that a driver's decision to use a rural

highway exit after passing drug checkpoint signs may be considered as one factor in an officer's reasonable suspicion analysis, "although it is not a sufficient basis standing alone to justify a seizure." Carpenter, 462 F.3d at 987; see also Prokupek, 632 F.3d at 462 ("[R]easonable suspicion for a traffic stop cannot be based solely on the fact that a driver exits an interstate after seeing a sign indicating that a drug checkpoint lies ahead.").

A Fourth Amendment seizure that relies solely on a driver's decision to use a rural or "dead exit" following checkpoint signs falls short of the requirement of individualized, articulable suspicion of criminal activity. See United States v. Wright, 512 F.3d 466, 471 (8th Cir. 2008) ("[T]roopers were only to stop vehicles for which they had individualized suspicion of a traffic violation. In these circumstances use of a ruse checkpoint did not violate Wright's constitutional rights."); cf. Roth v. Green, 466 F.3d 1179, 1182-83 (10th Cir. 2006) (describing a ruse checkpoint operation at a rural highway exit in Colorado where "[n]o stops were to be made unless officers observed or otherwise had reasonable suspicion of some type of illegal activity associated with a particular vehicle").

We hold that an officer must identify additional suspicious circumstances or independently evasive behavior to justify stopping a vehicle that uses an exit after ruse drug checkpoint signs.[5] Neff's exit from the interstate after seeing the drug checkpoint

---

[5] In many so-called "ruse drug checkpoint" cases, an officer pulls over a vehicle that uses an exit after ruse checkpoint signs and then commits a traffic violation, often failing to come to a complete stop at the end of an off-ramp. See, e.g., United States v. Chavez Loya, 528 F.3d 546, 552 (8th Cir. 2008) (failure to observe stop sign at end of ramp); United States v. Wright, 512 F.3d 466, 467 (8th Cir. 2008) (same); United States v. Williams, 359 F.3d 1019, 1020 (8th Cir. 2004) (same); United States v. Martinez, 358

(continued...)

signs, even when coupled with the additional evidence the trooper observed, was insufficient to support a finding of reasonable, articulable suspicion to stop Neff's vehicle. The trooper did not observe a traffic violation, and the facts he gathered after Neff left the interstate contributed only marginally to reasonable suspicion. Neff was driving a vehicle registered to the adjoining county, took an exit onto a gravel road in a rural area, pulled into a driveway and stopped, looked "startled" or "surprised" when he saw the trooper, and then backed out of the driveway as if to turn around. Rather than individually scrutinize and dismiss individual factors, we simply hold that the facts presented here do not amount to a "particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (internal quotation marks omitted).

## III

On these facts, the trooper did not have reasonable suspicion to justify the initial stop of Neff's vehicle. For that reason, the district court should have suppressed the seized evidence as obtained in violation of the Fourth Amendment. We therefore REVERSE the district court's denial of the motion to suppress and REMAND with directions to vacate Neff's conviction.

---

(...continued)
F.3d 1005, 1006-07 (8th Cir. 2004) (same). Because a traffic stop is independently justified when an officer observes a violation of a traffic law, these cases are inapposite. See United States v. Prokupek, 632 F.3d 460, 462 (8th Cir. 2011) ("[S]ince any traffic violation, however minor, provides probable cause for a traffic stop, a traffic stop pursuant to a ruse checkpoint does not violate the Fourth Amendment if the driver commits a traffic violation when exiting the interstate." (citations, quotation marks, and brackets omitted)).

18